UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERIC ZACHARY ANDERSON,

Petitioner,

v.

CLARK E. DUCART, Warden,

Respondent.

Case No.  11-cv-02636-JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Eric Zachary Anderson, challenging the validity of a judgment obtained against him in state court.  Respondent filed an answer to the petition.  Petitioner has filed a traverse.  For the reasons set forth below, the petition is denied.[1]

## I.  PROCEDURAL HISTORY

On June 20, 2008, a Contra Costa County jury found petitioner and his codefendant Randy Salazar ("Salazar ") guilty of the murder of Matthew Stephens ("Stephens").  (Ex. 1 at 1492-1506.[2])  An earlier trial had ended in a hung jury.  (Id. at 1165-66.)  At the June 2008 trial, the jury found both petitioner and Salazar guilty of first-degree felony murder, attempted second-degree robbery, and carrying a loaded firearm while a member of a street gang.  (Id. at 1492-1506.)  As to

---

[1] Petitioner previously named Tim Virga, former warden of California State Prison – Sacramento, as the respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Clark E. Ducart, the current warden of Pelican Bay State Prison, where petitioner is currently incarcerated, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

[2] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated.

the murder and robbery, the jury also found true allegations that petitioner and Salazar committed the offenses for the benefit of a street gang.  (Id. at 1493-1500.)  On August 26, 2008, the trial court sentenced petitioner to the principal term of life without the possibility of parole and imposed a consecutive term of 25 years to life on the firearm enhancement.  (Id. at 1733.)

Petitioner directly appealed the judgment in the California Court of Appeal.  (Ex. 6.)  On August 31, 2010, in a reasoned opinion, the California Court of Appeal ordered the abstract of judgment amended to reflect the judgment of the trial court and in all other respects affirmed. People v. Salazar, No. A122794, 2010 WL 3420122 (Cal. Ct. App. Aug. 31, 2010).  On December 15, 2010, the California Supreme Court summarily denied the petition for review.  (Ex. 11.)

On June 2, 2011, petitioner filed a petition for writ of habeas corpus in this Court.  On November 2, 2011, petitioner filed an amended petition and motion to stay.  On April 4, 2012, the Court ordered the proceedings stayed so that petitioner could return to state court to exhaust state remedies as to several of the claims in the amended petition.

On April 27, 2012, petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (Ex. 12.)  He filed a supplement to the petition on July 12, 2012.  (Ex. 13.)  The California Supreme Court summarily denied the petition on July 18, 2012.  (Ex. 14.)

On August 2, 2012, petitioner filed a notice of exhaustion of state remedies and a "first amended petition" (FAP) in this Court.  On September 18, 2012, the Court reopened the action and ordered respondent to show cause why the FAP should not be granted.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal:[3]

*The Offense*

Matthew Stephens worked in San Francisco, but lived in Antioch.  He usually left his home to drive to work at 4:30 a.m.  He kept a blue blanket in his car so that he could sleep

---

[3] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

if he arrived at work early.  His Antioch neighborhood was not well lit and was on a thoroughfare that could allow for quick escape to other areas of the city.

On September 21, 2004, at approximately 4:30 a.m., defendants[4] were out "rooting," i.e., looking for someone to rob.  Salazar was a high-ranking member of the Elite Northern Empire, a subset of the Norteño gang in the Antioch area.  His street name was "Oso." [Petitioner] was an "independent Norteño," but police believed he was trying to associate himself with the Pittsburg Norteño subset "Crazy Ass Latinos," or "CAL."  His street name was "E-Lo."

Defendants saw Stephens standing by his car.  [Petitioner] later told his friend Michael Johnson that Stephens was putting on his shirt.  Armed with [petitioner's] revolver, [petitioner] walked up to Stephens and put the gun in Stephens' side.  Stephens resisted and struggled with [petitioner].  [Petitioner] shot Stephens in the face.  The autopsy physician removed a .22 bullet from Stephens' brain.

Stephens' blanket was found near his body.  It was soaked with blood, contained his glasses, and bore gunshot residue and a bullet hole consistent with a small caliber weapon, such as a .22.  No bullet casings were found at the scene, except for a .40 casing dropped by an investigating officer; this was consistent with a revolver being used as the murder weapon.

Just before the shooting, William Eby, a bus driver, was walking to work.  He walked past a housing complex and saw a white car enter the complex and park.  He thought it was odd for the car to be there so early in the morning.  Because there had been problems with stolen cars being dropped off in the complex's parking lot, Eby walked behind the white car to get its license plate number.  As he was six to 10 feet from the passenger side, the two men in the car turned to look at him.  Eby identified Salazar as the driver and [petitioner] as the passenger.  Defendants seemed "kind of agitated and stressed."

Eby walked past the car, which then proceeded down the street in his direction, passing him.  The car turned onto East Lake Drive.  Eby followed, turned the corner onto East Lake Drive, and saw the white car had stopped at the end of the block near the intersection with East Lake Court.  A few seconds later he heard a "pop," that sounded to him like a muffled shot from a small caliber gun.  After a few seconds, possibly no longer than 15, Eby saw the white car back up, spin around, and drive toward and past him at a speed of 50 miles per hour, in the direction of the waterfront.  Eby walked to the end of the block and saw Stephens' body lying by his car.  The driver's door was open and Eby heard the door chime, meaning the keys were in the ignition.  Eby called 911.

Defendants immediately drove to the waterfront.  Salazar threw into the water the handgun used to kill Stephens.  They changed clothes and abandoned the white car on East 6th Street, a few minutes from the crime scene.  Later that morning, Eby identified the car as the one he had seen that morning.  Near the car, police recovered clothing; a Budweiser

---

[4] All references to "defendants" in the Court of Appeal's opinion are to petitioner and his codefendant, Randy Salazar.

carton; and checks and identification in a number of different names, which appeared to have been stolen.

*The Ensuing Investigation*

The investigation of the homicide focused on defendants when police learned they had the white car, a Pontiac, at the time of the shooting.  As we shall see, defendants admitted the murder to several of their associates.

Police learned that Mariette Sarmiento had rented the white Pontiac shortly before the murder.  The day before the murder, September 20, 2004, Norteño member and methamphetamine dealer Gabriel Perez, along with his brother Eric, his cousin Michael Cole, and his friend Kristi Lopez, went to Sarmiento's hotel room and forcibly took the keys to the Pontiac.

Gabriel Perez and his companions left in the car.  Lopez drove.  Lopez kept the car all morning on the 20th, dropping Gabriel Perez off at the residence of Gary Elizondo, aka "Chief."  Elizondo's manor was 508½ West 16th Street, a half unit in the back of a house where people "hung out" to smoke methamphetamine.

Later in the day of the 20th, Lopez had the Pontiac at "Cadillac Dan" Vegas' house, at 509 West 15th Street-the block behind Elizondo's residence.  Lopez called her friend Nicole Martin and asked her to come by to pick up two garbage bags containing stolen items, including checks and driver's licenses.  Lopez wanted Martin to store the bags in her apartment, which was in a guarded and gated complex.  Martin went to Vegas' house. Lopez retrieved the bags from the Pontiac.

About 10:00 p.m. on the 20th, Antioch Police Officers Wisecarver and Koch went to Elizondo's house to investigate the theft of some checks.  They met with Lopez and saw the white Pontiac.  The officers also saw that Lopez was with a group of people which included [petitioner], Gabriel Perez, and his brother Eric.

Sometime after midnight or 12:30 the next morning – the morning of the murder – Gabriel Perez drove the white Pontiac from Elizondo's house to the home of Joseph "Jo Jo" Watts, near downtown Antioch.  [Petitioner] was there, along with Eric Perez and "Filthy Phil" Makinano.  Everyone at the house was smoking methamphetamine.  Defendant Salazar called and asked to be picked up and brought over to Watts' house.  Eric Perez drove the white Pontiac to Elizondo's house, possibly accompanied by [petitioner], picked up Salazar, and took him to Watts' house.

When Salazar arrived, he appeared agitated and paranoid: "Something was bugging him ... something was on his mind."  He went from room to room with his revolver in hand, thinking that someone else was in the house.  Watts was worried about whether Salazar was aggravated or frustrated.  Gabriel Perez told Watts that he would take care of Salazar if he got out of control.

About two and a half hours later, in the early morning of September 21, 2004, Gabriel and Eric Perez, "Filthy Phil" Makinano, and both defendants left Watts' home in the white Pontiac.  They dropped Makinano off in Pittsburg at a drug haven known as "The Crack

United States District Court
Northern District of California

Shack." Next they dropped Eric Perez off at Martin's guarded and gated apartment complex in Pittsburg. A surveillance videotape shows the Pontiac entering the complex at 3:40 a.m.-about 50 minutes before the murder. The tape showed that [petitioner] appeared to be driving. Gabriel Perez signed the security check-in sheet.

After dropping off Eric, only Gabriel Perez and defendants were left in the car. According to a statement Gabriel gave police, [petitioner] was driving.

The surveillance videotape shows the white Pontiac leaving Martin's apartment complex. Defendants drove Gabriel Perez to Elizondo's house, where he had arranged to meet Stephanie Taylor.

Defendants, now with the white Pontiac all to themselves, drove to East Lake Drive where they accosted Stephens and murdered him. Not long after the murder, and after they changed clothes, abandoned the white Pontiac, and disposed of the murder weapon, defendants went to the home of Salazar's girlfriend, Yamileh "Yami" Serrano.

Later that morning, Gabriel Perez awoke and called [petitioner] to find out the whereabouts of the white Pontiac. Salazar lied to him and told him the car – which defendants had abandoned near the crime scene – was downtown. Gabriel sent his brother Eric and [Phil] Makinano downtown on bicycles to retrieve the car. They could not find it.

Salazar went to Cadillac Dan's house and met with Gabriel, who confronted him about the missing car. Salazar's behaviour was suspicious, making Gabriel think Salazar had sold the Pontiac. Salazar told Gabriel Perez to stop looking for the Pontiac. Salazar also said that if he saw the car again he would "burn" it. Salazar admitted participation in the murder and attempted robbery to Gabriel Perez. Specifically, Salazar told Perez about his involvement and that [petitioner] and Stephens wrestled over the gun and the gun went off. Salazar told Gabriel not to tell anyone about the crimes, not even his brother Eric.

On the evening of the day of the murder, [petitioner] went to the home of "Tattoo Fernando" Flores to get a gang tattoo – apparently the word "Northern" above the initials "CAL," i.e., "Crazy Ass Latinos." "Little Fernando" Coria was at Flores' house. [Petitioner] told Coria about the murder and asked for his advice. Coria told [petitioner] he should not tell anyone about the killing; [petitioner] responded that he had already told eight people. Coria told [petitioner] to stop talking about the murder. [Petitioner] left without getting his tattoo.

At 6:40 p.m. on the evening of the day of the murder, police went to [Nicole] Martin's apartment and arrested Gabriel Perez on a probation violation. After four interviews, Gabriel told police that Salazar had admitted the murder and attempted robbery to him. Gabriel told police his disclosure of Salazar's admission put his life in jeopardy, and he was nervous.

A week after the murder, the *Contra Costa Times* published an article naming defendants as suspects in the murder, and published defendants' pictures. At that time, [petitioner] was staying with a friend, Michael Johnson, who saw the article. [Petitioner] admitted the murder and attempted robbery to Johnson. [Petitioner] told Johnson that Salazar had given him the gun; that he put the gun in Stephens' side; that [petitioner] and Stephens struggled

5

over the gun and [petitioner] shot Stephens; and after the shooting [petitioner] and Salazar changed clothes and got rid of the car.  Johnson told [petitioner] he should turn himself in. [Petitioner] surrendered to police in October 2004.

Salazar was apprehended in the early morning hours of October 3, 2004, after a lawful police pursuit unrelated to the murder.

Antioch Police Officer Thomas Lenderman qualified as an expert on street gangs, including the Norteño gang.  In his expert opinion, based on several factors, both defendants were active members of the Norteño gang.

Defendants did not testify at trial.  They presented expert testimony showing that the physical evidence linking them to the white Pontiac was inconclusive.  Through counsel, they attacked the credibility of prosecution witnesses and claimed innocence.  They assailed the identification testimony of Eby, and argued it was tainted by the newspaper photographs.  They argued that most of the prosecution witnesses were not to be believed because they had prior convictions, poor memories due to drug use, inconsistencies in their testimony, and motivations to lie.

People v. Salazar, 2010 WL 3420122, at *1-4 (footnotes omitted).

## III.  DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

United States District Court
Northern District of California

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412 (internal quotation marks omitted).  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review.  The Court of Appeal, in its opinion on direct review, addressed two of the claims petitioner raises in the instant petition.  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and, as to those claims, it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  The remaining claims were presented only to the California Supreme Court in petitioner's state petition for writ of habeas corpus, which was summarily denied.  When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  This "[i]ndependent review . . . is not de novo review of the

constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable." See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." See Harrington v. Richter, 131 S. Ct. 770, 784 (2011).

B.     Petitioner's Claims

    Petitioner asserts the following grounds for relief: (1) petitioner's rights to due process and a fair trial were violated by the prosecution's knowing use of torture and coercion to obtain statements implicating petitioner from witness Michael Johnson, suppression of prior exculpatory statements made by Johnson, and suppression of evidence showing government agents used coercion to obtain a statement from Johnson implicating petitioner; (2) defense counsel rendered ineffective assistance by failing to competently investigate the case and failing to present exculpatory evidence; (3) petitioner's right to due process and right to confront witnesses was violated by the prosecutor's questions that disclosed to the jury an inadmissible statement of witness Yamileh Serrano; and (4) petitioner's right to due process was violated by the admission of codefendant Salazar's extrajudicial statements implicating petitioner. The Court addresses these claims in turn.

        1.     Michael Johnson's Statements

    Petitioner claims his rights to due process and a fair trial were violated by the prosecution's knowing use of torture and coercion to obtain statements from witness Michael Johnson implicating petitioner, suppression of prior exculpatory statements made by Johnson, and suppression of evidence showing government agents used coercion to obtain a statement from Johnson implicating petitioner. FAP at 9. Petitioner presented this claim only on state habeas to the California Supreme Court, which summarily denied it.

            a. Background

    Johnson testified at length at the preliminary hearing about how petitioner confessed to him. Ex. 1 at 119-27. Johnson was represented by counsel at the preliminary hearing. Id. at 116.

    Johnson was also represented by counsel for his trial testimony on June 3, 2008. Ex. 4 at

1487-88.  Johnson testified with a grant of use immunity.  Id. at 1486.  He testified that petitioner came and asked if he could stay with him in September 2004.  Id. at 1461.  While petitioner was staying with Johnson, they discussed a newspaper article about a murder in Antioch.  Id. at 1464. The article included a picture of petitioner and indicated there was a warrant for his arrest.  Id. Johnson tried to talk petitioner into turning himself in.  Id. at 1465.

Johnson also testified at trial that on October 3, 2004, he voluntarily went to the Antioch Police Department at their request and talked with Detective Franzen.  Ex. 4 at 1490.  He testified that he did not recall telling Detective Franzen that petitioner denied any involvement in the shooting or that he had dropped petitioner off at his mother's house on any day.  Id. at 1490-91. Johnson later testified he told Detective Franzen that petitioner never admitted anything to him. Id. at 1492.

Johnson testified that on October 6, 2004, a number of officers came to his house.  Ex. 4 at 1492-93.  He testified they came into his house illegally.  Id. at 1474.  He recalled the officers put handcuffs on him and he tried to step out of them.  He testified that the officers violently took him to the ground.  He violently resisted the officers and was "really angry."  He did not recall threatening to kill the officers.  Id. at 1474, 1494-95.  A wrap or straight jacket was put on him before he was transported to the Antioch Police Department.  Id. at 1496-97.

Johnson continued to fight with the police officers at the station.  His finger was broken, and he was upset and hungry.  Ex. 4 at 1475.  He remained very angry while he was at the police department and flooded his cell twice.  The first time he flooded his cell, he was taken to an interview room and talked to some officers.  He did not recall telling the officers that petitioner had never told him anything about participating in the homicide.  Id. at 1475, 1497-99.  He was not sure if he flooded his cell again and did not remember that it took six officers to enter his cell and remove him, but he remembered being taken to the Contra Costa County jail in Martinez.  Id. at 1500.  He probably called his grandmother from that jail.  He did not recall telling her he was going to make up a statement.  Id. at 1500-01.  He did not recall telling the officers on October 6 that he asked petitioner if he did it and that petitioner denied it.  Id. at 1502-03.  Johnson repeatedly told the officers he wanted to get out of jail.  Id. at 1482-83.

United States District Court
Northern District of California

9

1    Johnson testified he remembered talking to Detectives Dee and Franzen at the jail in

2   Martinez, but did not recall anything he said.  Ex. 4 at 1466-70, 1472-74.  He was aware that some

3   of his statements were recorded.  Id. at 1482.  Johnson could not explain why he did not tell

4   Detective Dee about the conversation in which petitioner confessed to him about the murder when

5   he was interviewed at the Antioch Police Department.  Id. at 1475.  After Johnson gave his

6   statement to Detectives Dee and Franzen, he was not immediately released.  Instead, accessory

7   after the fact charges were filed against him.  Id. at 1470-71, 1507.  Johnson had prior convictions

8   for robbery and for receiving stolen property.  Id. at 1471-72.  He also had pending charges for

9   accessory to murder after the fact, resisting an executive officer, methamphetamine possession,

10   and misdemeanor hit and run.  Id. at 1471, 1479-80, 1488, 1639.  He was offered no benefits on

11   his pending cases in exchange for his testimony.  Id. at 1472.

12    Detective Dee testified he was not with Detective Franzen, but he was aware Franzen had

13   interviewed Johnson before he was taken into custody.  Ex. 4 at 1638.  Detective Dee was not

14   present, but was aware a number of officers went to Johnson's house on October 6 and there had

15   been a "major control issue."  Id. at 1639.  Detective Dee saw Johnson in a holding cell at the

16   Antioch Police Department on October 6.  Johnson had flooded his cell and water was pouring

17   out.  He was standing on his bed and initially refused to come out of his cell.  He eventually

18   cooperated, and Detective Dee interviewed him for about an hour to an hour and a half.  Johnson

19   said petitioner never told him anything.  Id. at 1640-42.  Johnson repeatedly said he wanted to go

20   home.  He said he would talk if he was released.  Johnson was brought back to his cell, which he

21   flooded a second time.  He was then taken to the detention facility in Martinez.  Id. at 1642-43.

22   Before he was taken to Martinez, Johnson screamed to be let out and said he would tell the

23   officers everything.  However, given the control problems and that Johnson flooded his cell twice,

24   the detectives had him transported to Martinez.  Id. at 1635-36.

25    Detective Dee interviewed Johnson in Martinez on October 7, 2004.  Johnson initially said

26   he would only provide a statement if they would release him.  Detectives Franzen and Dee

27   responded they would not give him any deals, but they would be happy to take a statement if he

28   wanted to cooperate.  Johnson became very angry and agitated.  The detectives got up, walked out

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1  of the room and shut the door.  Johnson banged on the door demanding that they come back in so

2  he could talk to them.  Ex. 4 at 1623-25.  The detectives returned.  Johnson said he would talk to

3  them but would not testify in court.  Detective Dee responded that if Johnson wanted to provide a

4  truthful statement, they would take it, but they were not going to play games or talk about what he

5  wanted.  Johnson said he would not lie.  Id. at 1625-26.  Johnson told the detectives how petitioner

6  described the circumstance of the murder to him.  Id. at 1628-32.

7      The record demonstrates that fear of testifying was a recurring issue throughout the trial

8  proceedings.  Before Johnson testified, Detective Dee had testified that Norteño gang members or

9  associates who provide the police with information or testify in court about fellow gang members

10  can end up dead.  Ex. 4 at 1226-27.  Serrano and Coria refused to testify despite having been

11  granted use immunity.  Id. at 1713-16, 1763-66, 1961-63.  Coria's prior testimony was admitted,

12  and he stated that he was in protective custody because of his statements to police about the case.

13  Id. at 2011-12.  Watts and Flores testified they could not recall critical details they told police after

14  the crime.  Id. at 1377, 1379, 1517-19.  Outside the presence of the jury, the trial court noted that

15  Flores' testimony that he was not a gang member was belied by his various gang tattoos.  Id. at

16  1540.  Gabriel Perez, who did testify at trial, testified at a hearing outside the presence of the jury

17  that he received death threats after the first trial and a week or two prior to the second trial.  Id. at

18  1255-56, 1318-20, 1325-26.  He testified that being identified as someone who has spoken to law

19  enforcement has "very negative results."  Id. at 1363.  Criminal street gang expert Thomas

20  Lenderman testified that a Norteño member or associate who testifies against another gang

21  member would be assaulted or killed.  Id. at 1859.

22          b.  Introduction of Johnson's Testimony and Prior Statements

23      Petitioner claims that the prosecutor committed misconduct by knowingly introducing

24  perjured testimony of witness Johnson.  In support of this claim, petitioner submits with his FAP a

25  declaration from Johnson dated April 22, 2011.  FAP Ex. A.  Therein, Johnson declares that he

26  truthfully told detectives from the Antioch Police Department that petitioner told him he had

27  nothing to do with the murder and that he was with petitioner the night of the murder.  Johnson

28  states that only after four officers came to his house and beat him while he was in handcuffs did he

lie and tell them that petitioner had admitted the murder to him.  Johnson declares that he told the prosecutor he had lied but she told him he had to testify to his prior statements "or go to prison."  See id.

A conviction obtained through the use of testimony which the prosecutor knows or should know is perjured must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury.  See United States v. Agurs, 427 U.S. 97, 103 (1976).  The result is the same when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears.  See Napue v. Illinois, 360 U.S. 264, 269 (1959).  To prevail on a claim based on Agurs/Napue, the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.  See United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003) (citation omitted).  In evaluating allegations of prosecutorial misconduct, this court considers whether the prosecution's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  See Hein v. Sullivan, 601 F.3d 897, 912 (9th Cir. 2010) (quotation marks omitted).

It does not appear from the record that Johnson's prior testimony from the preliminary hearing was ever introduced at trial.  Nor did the prosecution attempt to introduce any recording or transcript from Johnson's interview with police.  Nor did Detective Franzen testify to his interview with Johnson.  The Court therefore understands petitioner to be arguing that the prosecutor should not have called Detective Dee to testify to Johnson's out-of-court statements to police implicating petitioner.

First, petitioner fails to show that Johnson's out-of-court statements, as introduced through Detective Dee, were actually false.  A witness' later recantation generally is not a sufficient basis on which to find his previous testimony false.  See Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004) ("That a witness says some years later that she lied at trial does not furnish a basis for granting the writ on account of the state's knowing use of perjury."); see also Hysler v. Florida, 315 U.S. 411, 413 (1942) (noting that a defendant "cannot, of course, contend that mere recantation of testimony is in itself ground for invoking the Due Process Clause against a

conviction").

Second, as stated above, to establish  a due process violation, petitioner must show that the prosecution <u>knowingly</u> used perjured testimony.  Napue, 360 U.S. at 270-71.  Here, the prosecutor could reasonably have believed that Johnson's statements implicating petitioner, as introduced through Detective Dee, were truthful because those statements were consistent with Johnson's testimony at the preliminary hearing, where he was represented by counsel.  Additionally, the prosecutor could reasonably have believed that any later recantation by Johnson was made out of fear of gang retaliation.  Consequently, petitioner fails to provide a factual basis for attributing Johnson's alleged knowing presentation of perjury to the prosecution.  See Morales, 388 F.3d at 1179 (petitioner must establish factual basis for attributing to the government knowledge that the testimony was perjured).

Further, petitioner has failed to make a showing that introduction of Johnson's out-of-court statements "so infected the trial with unfairness" as to deny due process.  Hein, 601 F.3d at 912.  In particular, Johnson appeared at trial for cross-examination regarding his out-of-court testimony and the police interrogation techniques, a fact that courts have recognized safeguards admission of such statements against a due process violation.  Nasrichampang v. Woodford, 288 F. App'x 367, 368 (9th Cir. 2008) (quoting Williams v. Woodford, 384 F.3d 567, 596 (9th Cir. 2004)).  Johnson generally testified at trial that he could not recall the substance of any of his statements to the police.  Ex. 4 at 1466-75, 1490-91, 1497-99, 1502-03.  Moreover, while on the stand at trial, Johnson actually disclaimed his earlier out-of-court statements, clearly stating that he told Detective Franzen that petitioner never admitted anything to him.  Id. at 1492.

In any event, Johnson's statements cannot be said to have had a material effect on the trial.  The statements had limited value because they were contradicted by Johnson's trial testimony, which was essentially favorable to petitioner.  His out-of-court statement that petitioner confessed to him was cumulative to that of other witnesses.  Specifically, petitioner had also admitted the murder to Coria, and Salazar admitted to Gabriel Perez that he and petitioner committed the murder.  Ex. 3 at 87, 97-98, 118; Ex. 4 at 1288, 2021.  Eby identified petitioner.  Ex. 4 at 1159.  Petitioner was the only person connected with the Pontiac who matched the person visible in the

United States District Court
Northern District of California

13

surveillance video taken just before the murder.  Id. at 1227-29.  His DNA was on the pants and shoe left by the abandoned Pontiac.  Id. at 1803-04, 1815.  Consequently, there is not a reasonable likelihood Johnson's allegedly false out-of-court statements affected the jury's verdict.

Based on the above, the Court finds that the state court's rejection of petitioner's due process claim for admission of Johnson's out-of-court statements was not unreasonable. Accordingly, habeas relief is not warranted on this claim.

### c.  Failure to Disclose Exculpatory Evidence

Petitioner further contends that the prosecutor committed misconduct by suppressing possibly exculpatory evidence.  Specifically, petitioner claims the prosecution suppressed (1) Johnson's exculpatory statements, and (2) evidence that government agents used coercive force and threats to obtain Johnson's statement implicating petitioner.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at 87.  In order to succeed on a Brady claim, a petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued).  Banks v. Dretke, 540 U.S. 668, 691 (2004).  Evidence is material if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  Cone v. Bell, 556 U.S. 449, 469-70 (2009).

As to Johnson's exculpatory statements, as noted above, both Johnson and Detective Dee testified as to Johnson's statements to the police that petitioner never admitted anything to Johnson.  Petitioner does not point to any evidence that his counsel was denied access to transcripts or recordings from Johnson's interviews with police or other pretrial statements.

As to suppression of purported evidence that government agents obtained Johnson's statements by force or threats, this claim is premised on the assumption that the prosecution knew that Johnson's statements implicating petitioner were false.  As discussed above, the prosecutor

United States District Court
Northern District of California

United States District Court
Northern District of California

1   could reasonably have believed Johnson's statements to the police implicating petitioner were

2   truthful.  Further, petitioner again fails to show that his counsel was denied information about

3   Johnson's interview.  Johnson and Detective Dee testified at length about the circumstances under

4   which Johnson was taken into custody on October 6, 2004.  Johnson admitted that he violently

5   resisted the officers and tried to step out of his handcuffs.  Ex. 4 at 1474, 1493-95.  He continued

6   to struggle with the police so that he had to be forcibly removed from his house in a wrap.  Id. at

7   1496-97.  He flooded his cell, then spent an hour and a half telling the detectives that petitioner

8   said nothing to him about the homicide.  Id. at 1475, 1497-99, 1640-42.  He flooded his cell again.

9   He repeatedly demanded to be released and issued ultimatums while he was at both the Antioch

10  and Martinez detention facilities.  Id. at 1482-83, 1623-24, 1635-36, 1642-43. After the detectives

11  left the interview room in Martinez, Johnson banged on the door and insisted on speaking with

12  them.  The detectives indicated that they would take a truthful statement.  Ex. 4 at 1625-26.

13  Encouraging a witness to tell the truth does not constitute coercion.  Amaya-Ruiz v. Stewart, 121

14  F.3d 486, 494 (9th Cir. 1997), overruled on other grounds by United States v. Preston, 751 F.3d

15  1008 (9th Cir. 2014).  A review of the record shows that the state court could have reasonably

16  concluded that the evidence was not in fact favorable to petitioner and that nothing was suppressed

17  by the prosecution.

18          Finally, as also discussed above, Johnson's statements were not material.  His statements

19  implicating petitioner were cumulative to statements of other witnesses to whom petitioner and

20  Salazar had admitted the murder.  Petitioner's guilt was also independently established through

21  eyewitness testimony, video surveillance, and DNA evidence.

22          Based on the above, the state court could have reasonably concluded that the prosecution's

23  conduct was not improper, and thus, there was no violation of due process.  Accordingly, habeas

24  relief is not warranted on this claim.

25          2.      Ineffective Assistance of Counsel

26          Petitioner asserts various claims of ineffective assistance of his trial counsel, William

27  Gagen, all of which claims variously allege that counsel failed to investigate and present

28  exculpatory evidence.  FAP at 10-18.  Petitioner presented this claim only on state habeas to the

1   California Supreme Court, which summarily denied it.

2        Claims of ineffective assistance of counsel are examined under Strickland v. Washington,

3   466 U.S. 668 (1984).  In order to prevail on a claim of ineffectiveness of counsel, a petitioner must

4   establish two factors.  First, he must establish that counsel's performance was deficient, i.e., that it

5   fell below an "objective standard of reasonableness" under prevailing professional norms, id. at

6   687-88, "not whether it deviated from best practices or most common custom," Harrington v.

7   Richter, 131 S. Ct. 770, 788 (2011) (citing Strickland, 466 U.S. at 690 ).  "A court considering a

8   claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was

9   within the 'wide range' of reasonable professional assistance."  Id. at 787 (quoting Strickland, 466

10  U.S. at 689).

11       Second, he must establish that he was prejudiced by counsel's deficient performance, i.e.,

12  that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

13  proceeding would have been different."  Strickland, 466 U.S. at 694.  A reasonable probability is a

14  probability sufficient to undermine confidence in the outcome.  Id.  Where the petitioner is

15  challenging his conviction, the appropriate question is "whether there is a reasonable probability

16  that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at

17  695.  "The likelihood of a different result must be substantial, not just conceivable."  Richter, 131

18  S. Ct. at 792 (citing Strickland, 466 U.S. at 693).  It is unnecessary for a federal court considering

19  an ineffective assistance of counsel claim on habeas review to address the prejudice prong, i.e., the

20  second factor of the Strickland test, if the petitioner cannot establish incompetence, as required

21  under the first prong.  Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

22       The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential, and

23  when the two apply in tandem, review is doubly so."  Richter, 131 S. Ct. at 788 (quotation marks

24  and citations omitted).  "[T]he question [under § 2254(d)] is not whether counsel's actions were

25  reasonable.  The question is whether there is any reasonable argument that counsel satisfied

26  Strickland's deferential standard."  Id.

27       "[S]trategic choices made after thorough investigation of law and facts relevant to

28  plausible options are virtually unchallengeable; and strategic choices made after less than

United States District Court
Northern District of California

16

complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Strickland, 466 U.S. at 690-91.  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Id. at 691.

That an attorney might have conducted a more thorough investigation does not establish deficient performance.  Burger v. Kemp, 483 U.S. 776, 794 (1987).  "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."  Rompilla v. Beard, 545 U.S. 374, 383 (2005).  The question is not what the best lawyer or even what most good lawyers would have done, but whether a reasonable lawyer could have acted as defense counsel did.  Coleman v. Calderon, 150 F.3d 1105, 1113 (9th Cir. 1998), rev'd on other grounds, 525 U.S. 141 (1998).  Thus, the relevant inquiry is not what trial counsel could have done, but whether counsel's actions were reasonable.  Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998).

To succeed on a claim that counsel was ineffective in failing to call a favorable witness, a federal habeas petitioner must identify the witness, provide the testimony the witness would have given, show the witness was likely to have been available to testify and would have given the proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony been introduced, the jury would have reached a verdict more favorable to the petitioner.  See Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).  A petitioner's mere speculation that the witness would have given helpful information if interviewed by counsel and called to the stand is not enough to establish ineffective assistance.  See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).

a.  DNA Evidence

Petitioner claims that counsel was ineffective because he failed to present evidence that DNA testing conducted during the trial revealed that a bloodstain from shoes found at the abandoned white car originated from a person named "Shane Sykes" and that Sykes had a criminal

history.  FAP at 10-11.  The record indicates that the DNA on the shoelaces was identified on December 13, 2007, in the middle of the first trial, as belonging to Shane Patrick Sikes.  Ex. 1 at 1043.[5]  Detective Franzen came to court with a report and a taped interview of Sikes from San Quentin.  The court ordered the prosecution to provide any further investigation of Sikes to the defendants.  Id. at 1046.  On December 14, 2007, none of the parties indicated they intended to call Sikes as a witness.  Id.  However, on December 17, 2007, the prosecution sought to have Sikes transported from San Quentin to testify.  Id. at 1058.  The record indicates that Sikes did not testify at either trial.  Id. at 1065-67, 1073-74.

Thus, defense counsel was aware of the presence of Sikes' DNA on the shoelaces and made the tactical decision not to call him as a witness.  "Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial."  Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999).  The prosecutor's attempt to call Sikes as a witness during the first trial reveals that his testimony would have assisted the prosecution, not petitioner.

Defense counsel's decision to rely on the inconclusive nature of the DNA evidence was a reasonable strategic choice.  Relying on the accuracy of the DNA identifications was a double-edged sword because the prosecution's DNA expert testified that petitioner was a potential contributor to a cutting from the tongue of the left shoe and one of the four cuttings from the jeans.  Ex. 4 at 1803, 1804, 1810, 1815.  However, the expert also testified that the importance of the inclusion of petitioner's and Salazar's DNA on some of the samples was diminished due to the number of potential contributors and the degraded nature of the samples.  Id. at 1805-06, 1815, 1817.  There were three or four individuals in each of the cuttings from the shoes, and at least four individuals were identified from the cuttings from the jeans.  Id. at 1800, 1804.  Moreover, the DNA expert testified that Stephens, Salazar, and petitioner were all eliminated as sources of the three very dilute bloodstains on the shoelace of the left shoe.  Id. at 1809-10, 1814-15, 1818.  Thus, the jury was aware the blood was from a third party.  Under these circumstances, defense counsel could have reasonably concluded that challenging the DNA identifications was

United States District Court
Northern District of California

---

[5]  The first trial ended in a mistrial on January 3, 2008 due to a hung jury.  Ex. 1 at 1165-66.

United States District Court
Northern District of California

1    not worthwhile.  Id. at 2212-13.

2        Petitioner further contends defense counsel was ineffective for failing to investigate Sikes.

3    FAP at 11.  Defense counsel reasonably relied on Franzen's report and taped interview with Sikes

4    in San Quentin.  Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986) (failure to

5    interview not ineffective where counsel had access to witnesses' statements taken by government,

6    supporting documents, and FBI reports).  Moreover, petitioner does not explain what he sought to

7    gain, let alone provide any evidence showing what testimony or exculpatory evidence Sikes would

8    have provided.  Petitioner's mere speculation that Sikes would have been helpful does not establish

9    ineffective assistance.  See Bragg, 242 F.3d at 1087 (a petitioner's mere speculation that the

10   witness would have given helpful information if interviewed by counsel and called to the stand is

11   not enough to establish ineffective assistance); Ceja v. Stewart, 97 F.3d 1246, 1255 (9th Cir. 1996)

12   ("[Petitioner] fails to explain what compelling evidence additional interviews would have

13   unearthed"); United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987) (petitioner "offers no

14   indication of what these witnesses would have testified to, or how their testimony might have

15   changed the outcome of the hearing").

16       Based on the above, the state court could have reasonably concluded that defense counsel

17   was not ineffective in choosing not to challenge the DNA identifications.  Accordingly, habeas

18   relief is not warranted on this claim.

19           b.  Identification Cards

20       Petitioner claims defense counsel was ineffective for failing to interview or investigate "U-

21   U" Logan, Hammond Miles, and Valentine Prado.  He claims identification cards for "U-U"

22   Logan and Hammond Miles were found in the abandoned white Pontiac and that a witness to the

23   crime, Valentine Prado, looked at Logan's and Miles' identification cards and said they could

24   "possibly" be the men he saw committing the crime.  FAP at 11.

25       According to Prado's statement to investigating officers, he saw petitioner and Salazar as

26   they were abandoning the white Pontiac; Prado was not a witness to the murder.  FAP at Ex. C;

27   Ex. 1 at 31-35.  Petitioner provides only his self-serving statement that Prado said that Logan and

28   Miles could "possibly" be the men Prado saw by the car based on their identification cards, which

19

1   is insufficient to show incompetence.  Dows v, Wood, 211 F.3d 480, 486 (9th Cir. 2000)

2   (petitioner's self-serving affidavit that alibi witness existed insufficient evidence of attorney's lack

3   of investigation).

4          Moreover, the personal checks, identification cards, credit cards, mail and photographs

5   found in the Pontiac were in a variety of names, consistent with having been stolen.  Ex. 4 at

6   1006-07, 1012, 1020-21.  The identification cards attributable to Miles and Logan were found in a

7   pink  zipper purse along with blank personal checks and bank cards.  Id. at 1006-07, 1018.

8   Defense counsel could reasonably have decided not to investigate the owners of the identification

9   cards believing they were victims of theft, not killers who left their identifications in a woman's

10  purse in an abandoned getaway car.  "[C]ounsel need not interview every possible witness to have

11  performed proficiently."  Riley v. Payne, 352 F.3d 1313, 1318 (9th Cir. 2003).

12         Finally, defense counsel was not incompetent for failing to interview Prado because he

13  had already been interviewed by the police.  FAP at Ex. C; Ex. 1 at 31-35; Ex. 4 at 1007.  Failure

14  to interview a witness is not incompetent where defense counsel knows the witness' account.

15  Eggleston, 798 F.2d at 376.  In any event, petitioner cannot show prejudice because he fails to

16  demonstrate how any evidence related to the identification cards would have changed the result of

17  the trial.  Bragg, 242 F.3d at 1089.

18         Based on the above, the state court could have reasonably concluded that defense counsel

19  was not ineffective in choosing not to investigate "U-U" Logan, Hammond Miles, and Valentine

20  Prado.  Accordingly, habeas relief is not warranted on this claim.

21             c.  Victim's Uncle and Brother

22         Petitioner claims defense counsel should have interviewed the victim's uncle, Randy

23  Collins, and the victim's brother, Bobby, because Collins said that Bobby "might have knowledge

24  of what happened to the victim."  FAP at 11.

25         Detective Dee testified that he spoke with Collins, who said that Stephens lived with him.

26  Ex. 4 at 1216.  Collins heard Stephens getting ready for work, but he went back to sleep and heard

27  nothing after that.  Id. at 1217.  Because defense counsel knew Collins' account, he was not

28  incompetent for not seeking to interview him again.  Eggleston, 798 F.2d at 376.  Moreover,

United States District Court
Northern District of California

1   Stephens' family was hostile to the defense and unlikely to cooperate.  Ex. 1 at 794.  Finally,

2   petitioner does not show prejudice because he provides no declarations regarding what Collins or

3   Stephens' brother would have testified to or how their testimony would have changed the result of

4   the trial.  Bragg, 242 F.3d at 1089; Dows, 211 F.3d at 486.

5        Based on the above, the state court could have reasonably concluded that defense counsel

6   was not ineffective in choosing not to interview the victim's uncle and brother.  Accordingly,

7   habeas relief is not warranted on this claim.

8                    d.  Earlier Gunshot Incident

9        Petitioner claims that defense counsel should have presented testimony by four residents of

10  the East Lake crime scene area who allegedly reported they "heard 5 to 8 shots earlier during the

11  night of the murder and that they saw a car speed off after those gunshots were heard."  FAP at 11-

12  12.

13       Petitioner does not disclose the time or location of the purported shots or any reason to

14  believe the prior shots were related to the one muffled shot heard by Eby.  Thus, petitioner fails to

15  establish that defense counsel's decision not to call the residents fell below an objective standard

16  or reasonableness.  See Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir. 1990) (petitioner has

17  burden of showing that counsel's performance was deficient); see also Jones v. Gomez, 66 F.3d

18  199, 205 (9th Cir. 1995) (conclusory allegations of ineffective assistance of counsel do not

19  warrant federal habeas relief).

20       Further, petitioner does not show prejudice because he provides no declarations by the

21  purported witnesses regarding their alleged accounts.  Thus, he fails to show that testimony by the

22  four residents would have created a substantial likelihood of a different result.

23       Based on the above, the state court could have reasonably concluded that defense counsel

24  was not ineffective in choosing not to present testimony of the four East Lake residents.

25  Accordingly, habeas relief is not warranted on this claim.

26                    e.  Recording of Conversation with Coria

27       Petitioner claims that defense counsel should have introduced a recording of a conversation

28  between petitioner and Coria in which Coria was wearing a wire and petitioner said "that he was

21

1    not there when the murder was committed." FAP at 12.

2          Petitioner does not point to anything in the record showing there was such a recording.

3    Assuming there was, he does not establish what exactly he said or the context in which he denied

4    being present at the murder, let alone that his statements would have changed the result of trial.

5    Further, accepting as true that there was such a recording, it likely would have been inadmissible

6    as hearsay under section 1200 of the California Evidence Code.[6] Failing to introduce inadmissible

7    evidence does not constitute ineffective assistance. Stanley v. Schriro, 598 F.3d 612, 620 (9th Cir.

8    2010).

9          Based on the above, the state court could have reasonably concluded that defense counsel

10   was not ineffective in choosing not to introduce the purported recording of petitioner's

11   conversation with Coria. Accordingly, habeas relief is not warranted on this claim.

12                     f.   Recording of Johnson's Conversation

13         Petitioner claims defense counsel should have introduced recorded phone calls that

14   Johnson made from jail to his grandmother, in which Johnson said he would make up a statement

15   for the detectives so that he could go home. FAP at 12.

16         As discussed above, Detective Dee testified that Johnson told his grandmother in a

17   recorded phone call that he was going to make up a statement. Ex. 4 at 1643-44. Consequently,

18   defense counsel could have reasonably determined that introduction of the recording would have

19   been cumulative. Further, because Detective Dee already testified about the contents of the

20   recording, petitioner cannot show prejudice.

21         Based on the above, the state court could have reasonably concluded that defense counsel

22   was not ineffective in choosing not to introduce the recording of Johnson's conversations with his

23   grandmother. Accordingly, habeas relief is not warranted on this claim.

24                     g.   Evidence of Petitioner's Location Before the Murder

25         Petitioner claims defense counsel rendered ineffective assistance by failing to introduce

26

27   ───────────────

28   [6] Pursuant to California law, "'Hearsay evidence' is evidence of a statement that was made other
     than by a witness while testifying at the hearing and that is offered to prove the truth of the matter
     stated." Cal. Evid. Code § 1200(a).

United States District Court
Northern District of California

evidence that Coria told the Antioch police on October 3, 2004, that he was with petitioner and Johnson "at Emily and Lyle's apartment" on the night before the murder, that Johnson told the police the same thing on September 26, 2004, and that petitioner said the same thing in a recorded call made on October 4, 2004.  FAP at 13.

Petitioner's claim does not warrant relief because he fails to provide any evidence that Coria or Johnson were with petitioner at Emily and Lyle's house at the time of the killing, which is when his whereabouts were relevant.  Coria refused to testify at petitioner's second trial despite being given immunity. Ex. 4 at 1960-63, 1966-67.  His prior testimony was admitted at petitioner's second trial, but in his prior testimony, Coria stated that he recalled very little about what he said to the detectives.  Id. at 1977-81, 1989.  Moreover, Detective Franzen testified that Coria told him he saw petitioner and Johnson at Emily and Lyle's house the night before the murder.  Id. at 2019.  Therefore, evidence of Coria's prior statement was introduced at trial.

As discussed above, Johnson failed to recall at trial anything he said to Detective Franzen about being at Emily and Lyle's house the night before the shooting or about dropping petitioner off at his mother's house.  Ex. 4 at 1490-91.  He testified that he did not go to Emily and Lyle's house that night.  Id. at 1505-06.

Finally, evidence that petitioner was at Emily and Lyle's house at some point on the evening before the murder would not have assisted petitioner because the evidence showed that petitioner and Salazar went to several different locations before Stephens was killed at around 4:30 a.m.

Based on the above, the state court could have reasonably concluded that defense counsel was not ineffective in choosing not to introduce statements relating to petitioner's whereabouts on the evening preceding the murder.  Accordingly, habeas relief is not warranted on this claim.

h.  Mariette Sarmiento

Petitioner contends that defense counsel was ineffective for failing to interview Mariette Sarmiento.  FAP at 13.  As discussed above, Sarmiento was the person who rented the white Pontiac shortly before the murder, and Gabriel Perez stole it from her.

Again, defense counsel could reasonably have relied on police interviews of Sarmiento.

United States District Court
Northern District of California

23

1  Ex. 4 at 1218-21, 1233-35, 1238-40.  Counsel is not required to interview every possible witness.

2  Riley v. Payne, 352 F.3d at 1318.  Moreover, Gabriel Perez confirmed that the group took

3  Sarmiento's car and left without her.  Ex. 4 at 1268-70.  Finally, because petitioner fails to put

4  forth any exculpatory information that he believes Sarmiento would have provided, he does not

5  show prejudice.

6       Based on the above, the state court could have reasonably concluded that defense counsel

7  was not ineffective in choosing not to interview Sarmiento.  Accordingly, habeas relief is not

8  warranted on this claim.

9           i.  Gary Elizondo

10      Petitioner claims defense counsel was ineffective for failing to interview Gary "Chief"

11  Elizondo to confirm whether Gabriel Perez was dropped off at his house as Gabriel Perez said he

12  was.  Petitioner contends defense counsel should have "interviewed Elizondo in an effort to

13  disprove Gabe's assertion."  FAP at 13.

14      Habeas relief is unavailable because petitioner fails to provide a declaration from Elizondo

15  contradicting Gabriel Perez's testimony.  Moreover, Stephanie Taylor testified she went to

16  Elizondo's house between 3:00 and 4:00 a.m. and saw that everyone there, including Elizondo,

17  was sleeping.  Taylor saw Gabriel Perez talking on his phone outside, and they decided to go back

18  to the room where she was staying.  Ex. 4 at 1584-86, 1595-96, 1598-99.  Because Taylor testified

19  that Elizondo was asleep when she and Perez met at his house, defense counsel could have

20  reasonably decided not to contact Elizondo to confirm Taylor and Perez's accounts.

21      Based on the above, the state court could have reasonably concluded that defense counsel

22  was not ineffective in choosing not to interview Elizondo.  Accordingly, habeas relief is not

23  warranted on this claim.

24           j.  Cadillac Dan

25      Petitioner contends defense counsel was ineffective for failing to interview "Catholic Dan,"

26  whom Gabriel Perez said was present when Salazar confessed to him.  FAP at 13-14.

27      Habeas relief is unavailable because petitioner fails to provide a declaration by "Catholic

28  Dan" contradicting Perez's testimony.  In any event, petitioner misstates the record.  He appears to

United States District Court
Northern District of California

refer to the witness referred to as "Cadillac Dan" in the trial testimony.  Ex. 4 at 1285, 1934.  Perez

testified at trial that he and Salazar were outside, in front of "Cadillac Dan's" house, and that no

one else was present when Salazar confessed to him.  Id. at 1285-90.

Based on the above, the state court could have reasonably concluded that defense counsel

was not ineffective in choosing not to interview Cadillac Dan.  Accordingly, habeas relief is not

warranted on this claim.

### k.  Philip Makinano and Eric Perez

Petitioner claims defense counsel was ineffective for failing to interview Philip Makinano

and Eric Perez.  Petitioner contends that they "left their fingerprints in the alleged get-a-way car

[and] both were picked out in a line-up by Mr. Eby, who said they were 'possibly' the people he

saw in the get-a-way car immediately prior to the shooting."  FAP at 14.

Because petitioner provides no declaration from either Philip Makinano or Eric Perez

regarding what they might have testified to, habeas relief is unavailable.  In any event, petitioner's

fingerprint expert testified that she was able to identify nine latent prints from the Pontiac.  Ex. 4

at 2055.  She compared them with known prints of petitioner, Salazar, Gabriel and Eric Perez, and

Lopez.  Id. at 2056.  Three prints from the left door were Gabriel Perez's.  Id. at 2056-57.  Lopez's

prints were identified on the left front door and a Lay's chip bag.  Id. at 2057-58. Eric Perez left

prints on the right rear quarter panel, the roof above the right rear door, and two others on

unspecified parts of the car.  Id. at 2058-59.  Petitioner's and Salazar's prints were not found on the

car.  Id. at 2059.  The expert was not able to identify any of the other prints.  Id. at 2060.  The

evidence does not show that Makinano's prints were found on the car.  That fingerprints of Lopez,

and Eric and Gabriel Perez were found on the white Pontiac is consistent with the trial testimony

that a number of individuals rode around in the car after Gabriel Perez took it from Sarmiento.

Thus, petitioner fails to show incompetence or prejudice.  Further, as discussed in detail below,

Eby told police officers that the two men he saw were white, and he acknowledged that Eric Perez

was not white.  Id. at 1736, 1774-75, 1781-82.

Based on the above, the state court could have reasonably concluded that defense counsel

was not ineffective in choosing not to interview Philip Makinano and Eric Perez.  Accordingly,

1   habeas relief is not warranted on this claim.

2       l. Kristi Lopez

3       Petitioner claims defense counsel was ineffective in failing to interview Lopez, her

4   boyfriend, Eric Perez, and Philip Makinano because Lopez told the police that Eric Perez and

5   Philip Makinano drove her and her boyfriend to Bethel Island.  Petitioner contends that "the four

6   would likely have cast doubt on Gabe's timeline of the events, especially with respect to where the

7   car was on the night in question and who was in it."  FAP at 14.

8       Petitioner's failure to provide any supporting documentation precludes relief.  In addition,

9   the surveillance tape showed the white Pontiac entering Martin's gated community in Pittsburg at

10  approximately 3:00 a.m.  Ex. 4 at 1222, 1227.  The name Gabriel is shown on a sign-in log at 3:40

11  a.m.  Id. at 1247.  Thus, the location of the car is confirmed by strong independent evidence.

12  Moreover, Detective Dee spoke with Lopez, and defense counsel was not incompetent for failing

13  to rely on that interview.  Id. at 1229-30.

14      Based on the above, the state court could have reasonably concluded that defense counsel

15  was not ineffective in choosing not to interview Lopez, her boyfriend, Eric Perez, and Philip

16  Makinano regarding the location of the car.  Accordingly, habeas relief is not warranted on this

17  claim.

18      m. Witness Jones

19      Petitioner claims defense counsel was ineffective for failing to interview a person named

20  Jones, who saw a white van occupied by a brown-skinned male at about 5:00 a.m. near where the

21  Pontiac was abandoned.  FAP at 14-15.

22      According to the police report, Jones stated she saw a white minivan occupied by one male

23  in her apartment complex's parking lot at about 5:00 a.m.  The van's headlights were on.  It backed

24  out of the complex, and the headlights went off.  It stayed parked with the motor running for five

25  to ten seconds.  Then the headlights came on, and the van went west on Sixth Street.  Jones stated

26  the driver had brown skin and medium-length dark brown hair, but she would not be able to

27  identify him.  FAP at Ex. H.

28      Here, the evidence showed that the killers abandoned the Pontiac and left the area.  In

United States District Court
Northern District of California

26

addition, the eyewitnesses, Prado and Eby, described the killers as white.  Ex. 1 at 19-20, 32, 34; Ex. 4 at 1733, 1736, 1746, 1775; FAP Ex. C.  Thus, defense counsel reasonably relied on Jones' interview with the police, which revealed no connection between the white minivan and Stephens' murder.  Moreover, there is no reasonable likelihood that admission of evidence of Jones' observation of the white minivan would have affected the outcome of the trial.

Based on the above, the state court could have reasonably concluded that defense counsel was not ineffective in choosing not to interview Jones.  Accordingly, habeas relief is not warranted on this claim.

n.  Rebecca Sanchez

Petitioner claims defense counsel was ineffective for failing to call as a witness Rebecca Sanchez.  FAP at 15-17.  Petitioner attaches to his FAP a declaration from Sanchez, dated April 14, 2011, in which she states that Gabriel Perez came to her mother's house on Bryan Way in Antioch at about 5:15 a.m. on September 21, 2004, wearing only a t-shirt and underwear, and no shoes or pants.  FAP Ex. G.  Gabriel Perez asked Sanchez for some shoes and pants, and she refused.  Id.  Sanchez states that Gabriel told her "he was buying some pills off the white boy and it all went bad."  Id.  Sanchez states she would have called the police but she "wanted nothing to do with Gabe Perez and his problems."  Id.

Petitioner admits that defense counsel interviewed Sanchez.  See FAP at 15; Ex. 1 at 1591-92.  Defense counsel's strategic decision not to call Sanchez after interviewing her is "virtually unchallengeable."  Strickland, 466 U.S. at 690-91.

Petitioner's first claim in relation to Rebecca Sanchez is that Sanchez "saw Gabe and Eric in a white van outside her house" at about 6:00 a.m., "testimony [which] would have discredited the alibis of the Perez brothers and placed them at the 6th Street crime-scene."  FAP at 15.  In her declaration, however, Sanchez does not mention Eric Perez at all.  In addition, because the murder occurred at about 4:30 a.m. and the evidence shows that the killers abandoned the Pontiac, changed clothes and fled on foot, the Perez brothers' presence on Bryan Way an hour and a half later would not tend to incriminate them.

Petitioner's second claim in relation to Rebecca Sanchez is that Sanchez's testimony would

27

have connected Gabriel Perez to the murder.  See FAP at 16-17.  Sanchez's declaration, however, is consistent with Gabriel Perez's and Taylor's testimony that Gabriel Perez had to leave Taylor's apartment so quickly that he left behind his pants and shoes.  Ex. 4 at 1282, 1306, 1355, 1587. Her declaration does not suggest Gabriel Perez was the killer, who was clothed.  At the preliminary hearing, Prado testified he told the police he saw the two men change their clothes at the white Pontiac before walking away.  He saw the passenger change his shoes and give a pair of shoes to the driver.  Ex. 1 at 32-33.  The passenger was wearing a white t-shirt, blue jeans, and a red belt.  Id. at 34.  There was men's and women's clothing in the trunk and interior of the Pontiac. Ex. 4 at 1007, 1014-15.  Had defense counsel introduced Sanchez's statement that Gabriel Perez was not wearing pants or shoes, the prosecution would have responded by introducing Prado's statement that the men at the white Pontiac left wearing pants and shoes.  The prosecutor could also have elicited testimony from Andrea De Leon about being woken up by petitioner and Salazar loudly tapping on her bedroom window between 5:00 and 6:30 a.m. the morning of the murder. Ex. 2 at 3; Lord v. Wood, 184 F.3d 1083, 1085 (9th Cir. 1999) ("[I]t is impossible to judge any one piece of evidence without understanding the rest of the case. Omission of an item of proof may seem foolish until one understands the tradeoffs counsel would have had to make to include it.").

Moreover, Eby and Prado both described the two men they saw as white.  Ex. 1 at 19-20, 32, 34; FAP Ex. C.  When being shown photographs for identification on the day of the murder, Eby told the police officer the two men he saw were white.  Ex. 4 at 1733, 1736, 1746, 1775. When shown a group of photographs, he said that Eric Perez's face had a familiar cheek and jaw structure to the driver's, but acknowledged that Eric was not white and he was pretty sure the driver was white.  Id. at 1736, 1774-75, 1781-82.  He did not identify Gabriel Perez when shown his photo.  Id. at 1736.  Petitioner is white.  Ex. 2 at 6; Ex. 4 at 1909.  Gabriel Perez appears Hispanic and has dark features and black hair.  Ex. 4 at 1228.  Because the two eyewitnesses described the killers as white, defense counsel's decision not to introduce evidence attempting to throw suspicion on Gabriel Perez, a clearly Hispanic male, was reasonable.

Based on the above, the state court could have reasonably concluded that defense counsel

1   was not ineffective in choosing not to call Rebecca Sanchez as a witness.  Accordingly, habeas

2   relief is not warranted on this claim.

3           o.  Petitioner's Clothing

4           Petitioner claims defense counsel was ineffective in failing to call Officers Cook and

5   Wisecarver of the Antioch Police Department to testify that they saw petitioner the night before

6   the murder wearing green camouflage pants and a black shirt, clothes which were inconsistent

7   with the clothes left at the crime scene and "inconsistent with the description of the clothing of the

8   shooter as described by Eby and Prado."  FAP at 15.

9           The record shows that Officer Koch testified that he saw petitioner wearing green

10  camouflage pants and a black shirt the night before the murder.  Ex. 4 at 1200, 1204.  Defense

11  counsel could have reasonably concluded that further testimony on this point would have been

12  cumulative.  Moreover, contrary to petitioner's contention, Eby testified that the two men in the

13  Pontiac were wearing dark clothing.  Id. at 1002.

14          Based on the above, the state court could have reasonably concluded that defense counsel

15  was not ineffective in choosing not to call officers to testify to petitioner's clothing.  Accordingly,

16  habeas relief is not warranted on this claim.

17          p.  Jo Jo Watts' Neighbor

18          Petitioner claims defense counsel was ineffective for failing to interview Jo Jo Watts's

19  neighbor to discredit Watts' statement that he was talking to his neighbor when petitioner and

20  Gabriel Perez drove up in a white car.  Petitioner contends that defense counsel should have

21  interviewed the neighbor "to ascertain whether he could have developed evidence through the

22  neighbor to impeach Watts's account."  FAP at 15-16.

23          Petitioner's failure to provide a declaration from the neighbor precludes relief.  There is no

24  evidence that Watts' neighbor could have identified any of the individuals at Watts' house.

25  Moreover, Watts was not sure if petitioner was with Gabriel Perez when he first drove up in the

26  Pontiac.  Ex. 4 at 1371-72, 1384, 1393-94, 1397-98.  At first he did not recall whether petitioner

27  was even at his house, although on cross-examination he testified petitioner was there with

28  Salazar, Makinano, Gabriel Perez, and Eric Perez.  Id. at 1374-75, 1395-98.  Thus, defense

United States District Court
Northern District of California

United States District Court
Northern District of California

1    counsel could have reasonably concluded that interviewing the neighbor would not have

2    undermined Watts's credibility.

3           Based on the above, the state court could have reasonably concluded that defense counsel

4    was not ineffective in choosing not to interview Watts's neighbor.  Accordingly, habeas relief is

5    not warranted on this claim.

6                  q.  Jared Rubeo and Nicole Martin

7           Petitioner claims defense counsel was ineffective for failing to interview Jared Rubeo and

8    Nicole Martin to discredit Gabriel Perez's alibi.  FAP at 16.

9           Petitioner does not establish where in the record Gabriel Perez used Rubeo and Martin as

10   an alibi, and, as discussed above, defense counsel's decision not to introduce evidence attempting

11   to throw suspicion on Gabriel Perez was reasonable.   In addition, defense counsel could

12   reasonably have relied on Detective Dee's interviews of Martin.  Ex. 4 at 1221-23.  In any event,

13   petitioner's failure to provide declarations from Rubeo or Martin precludes relief.

14          Based on the above, the state court could have reasonably concluded that defense counsel

15   was not ineffective in choosing not to interview Rubeo or Martin.  Accordingly, habeas relief is

16   not warranted on this claim.

17                 r.  Anthony Cole, Phil Makinano, and Eric Perez

18          Petitioner claims defense counsel rendered ineffective assistance by failing to interview

19   Anthony Cole, Phil Makinano, and Eric Perez regarding use of the white Pontiac the night before

20   the murder.  Specifically, petitioner contends that Cole admitted to police that Makinano and Eric

21   Perez were the last people to drive the car that he knew of, and "counsel did not attempt to

22   interview any of these witnesses regarding their knowledge of, or involvement in, the alleged

23   crimes."  FAP at 16.

24          The fact that Makinano and Eric Perez used the car the night before the murder would not

25   tend to incriminate them.  Further, defense counsel was not incompetent for relying on the police

26   interviews of Cole.  Finally, petitioner once again fails to provide declarations from these

27   purported witnesses, thereby precluding relief.

28          Based on the above, the state court could have reasonably concluded that defense counsel

1    was not ineffective in choosing not to interview Cole, Eric Perez, and Makinano.  Accordingly,

2    habeas relief is not warranted on this claim.

3           s.  Petitioner's Alibi

4           Petitioner claims defense counsel unreasonably failed to investigate his alibi, and he refers

5    to his prior contentions in support of this claim.  See FAP at 16.  The Court understands petitioner

6    to be arguing that defense counsel failed to investigate Michael Johnson, who petitioner claims to

7    have been with the night before the murder.

8           As discussed above, Johnson's declaration was contradicted by the trial testimony and

9    states that he dropped petitioner off hours before the murder.  The fact that petitioner was with

10   Johnson earlier in the evening does not make Johnson an alibi witness.  Further, there is no

11   evidence that defense counsel actually failed to investigate Johnson.  Johnson's declaration makes

12   no mention of his interactions with the defense.

13          Based on the above, the state court could have reasonably concluded that petitioner failed

14   to establish ineffectiveness of defense counsel regarding investigation of petitioner's purported

15   alibi.  Accordingly, habeas relief is not warranted on this claim.

16          t.  Gabriel Perez

17          Petitioner claims defense counsel rendered ineffective assistance by failing to introduce

18   evidence against Gabriel Perez.  FAP at 17-18.

19          As discussed above, because the eyewitnesses described the driver and passenger of the

20   Pontiac as white, and Gabriel Perez was dark and clearly Hispanic, defense counsel reasonably did

21   not seek to introduce evidence implicating him.  "An attorney need not pursue an investigation

22   that would be fruitless, much less one that might be harmful to the defense."  Richter, 131 S. Ct. at

23   789-90 (counsel had reason to question the truth of defendant's account of events, and pursuing

24   forensic evidence could have exposed his story as an invention).  "To support a defense argument

25   that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion

26   of doubt than to strive to prove a certainty that exonerates."  Id. at 790.  Here, it was reasonable for

27   counsel to pursue the first option.

28          Based on the above, the state court could have reasonably concluded that defense counsel

was not ineffective in choosing not to implicate Gabriel Perez.  Accordingly, habeas relief is not warranted on this claim.

### 3.    Yamileh Serrano

Petitioner claims his rights to due process and confrontation were violated by the prosecutor's questions to witness Yamileh Serrano ("Serrano"), insinuating that petitioner admitted to having taken part in the murder.  FAP at 18.  Petitioner also claims the prosecution improperly referenced the factual content of those questions during closing argument.  See Brief in Support of Petition at 34.  The highest court to have considered this claim in a reasoned opinion was the California Court of Appeal on direct appeal.

### a.  Background

The Court of Appeal summarized the background of this claim as follows:

Serrano was, to put it mildly, a reluctant witness.  She testified at the preliminary hearing, admitting she knew defendants, but denying she had any conversation with Salazar about the murder.  She admitted telling police about such a conversation, but claimed she had been lying because she was scared.  Serrano then asked for an attorney and refused to testify any further – even after a grant of transactional immunity and an order holding her in contempt.

Antioch Police Detective Marty McCann testified at the preliminary hearing that Serrano had told him on October 6, 2004 – about two weeks after the murder – that Salazar had confessed to her that he and [petitioner] came upon Stephens when they were looking for someone to "rip or to jack."  Salazar told Serrano that [petitioner] got out of the car while Salazar stayed inside in order to be ready to leave; that [petitioner] wrestled with the victim and the gun went off; and that Salazar felt bad about the killing and felt sorry for Stephens' family.

Despite a bench warrant, Serrano did not appear for defendants' first trial.  That trial ended in a mistrial when jurors could not reach a verdict.

Before defendants' second trial, Serrano was taken into custody on a probation violation. The prosecutor informed the court that, should Serrano again refuse to testify, "the People will be requesting that she testify in front of the jury relat[ing] to an invalid refusal to answer questions particularly in light of the gang allegations in this case."

The prosecutor granted Serrano immunity for her trial testimony.  Outside the presence of the jury, the People called Serrano to the witness stand.  She invoked her Fifth Amendment privilege and refused to testify.  The court informed Serrano she had been granted immunity and no longer had a Fifth Amendment privilege to refuse to testify.  Serrano continued to refuse to answer questions, and the trial court found her in contempt and

remanded her into custody.  The prosecutor asked that the court require Serrano to "refuse to answer questions in front of the jury based on the gang enhancements in this case."

In court the next week, also outside the presence of the jury, the People again called Serrano to the stand.  Serrano continued to refuse to answer questions.  The prosecutor again asked that the court require Serrano to state her refusal in front of the jury.

The prosecutor then made this offer of proof:

"[I] believe Ms. Serrano would testify that the morning following the murder of Matthew Stephens ... when she got home to her parents' house, that Mr. Salazar was there. [Petitioner] had been there.  And that within about a week and a half of the murder she was at a motel with Mr. Salazar and that Mr. Salazar confessed to her."

From this offer of proof, the trial court determined that Serrano's testimony was "clearly relevant," and that it was appropriate under *People v. Lopez* (1999) 71 Cal.App.4th 1550 (*Lopez*) for the People to place Serrano before the jury "and let the jury draw whatever inference it chooses from her refusal to testify."

The People called Serrano to the witness stand in the presence of the jury. The following colloquy ensued:

"BY [THE PROSECUTOR]:

"Q.: Ms. Serrano, in late September or early October of 2004, did Randy Salazar tell you that he and [petitioner] were out looking for a car to jack or rob and that they saw a guy that they thought wouldn't fight back, that he looked a little dorky, and that [petitioner] got out of the car with the gun and wrestled with the guy, and [petitioner] shot the guy as he was standing by the car?

"A.: I'm still going to refuse.

"Q.: To what?

"A.: I'm going to go ahead and use my Fifth Amendment – or I can't, but I'm refusing to answer any questions.

"[THE PROSECUTOR]: Your Honor, will the Court, based on the People's grant of use immunity, order this witness to answer the question?

"THE COURT: Yes. [¶] Ms. Serrano, as we previously discussed, you have use immunity which was granted by the District Attorney's Office.  And based on the use immunity, I'm ordering that you answer these questions.

"THE WITNESS: I'm still refusing.

"BY [THE PROSECUTOR]:

"Q.: Okay. You understand that you have no valid Fifth Amendment privileges in this

33

case; do you not?

"A.: Yes, I do.

"Q.: And understanding that, you understand that you will be held in contempt of Court for refusing to answer these questions?

"A.: I understand that.

"Q.: Okay.  And that you will be held in custody for refusing to answer these questions?

"A.: I understand that.

"Q.: And Ms. Serrano, did Mr. Salazar tell you in late September or early October of 2004 that when the guy started to wrestle with [petitioner], because of the way [petitioner] was holding the gun he ended up shooting the guy in the face?

"A.: I'm refusing to answer any questions.

[¶] ... [¶]

"BY [THE PROSECUTOR]:

"Q.: Ms. Serrano, on-in the midmorning hours between 9:00 in the morning and 11:00 in the morning, did you arrive home at your parents' home in Antioch and find Mr. Salazar in your bedroom?

"A.: I'm refusing all questions.

"Q.: You're refusing to answer that question?

"A.: Yes.

"Q.: Okay.  And Ms. Serrano, were you in a dating relationship with Randy Salazar in 2004?

"A.: I'm not going to answer any questions.

"Q.: And did Randy Salazar in September of 2004 call you on the streets his 'wife'?

"A.: I'm still refusing to answer that.

"Q.: Ms. Serrano, did Randy Salazar in late September or early October of 2004 tell you that he was very sorry for the murder of Matthew Stephens, that all Matthew was doing was getting ready to go to work, and that he had a lot of sympathy for Matthew's family?

"A.: Once again I'm refusing to answer."

Defense counsel asked the court to admonish the jury "that the words of counsel cannot be

considered as evidence." The court said it would consider an admonition, but did not give one at that time. Defense counsel did not object to the questioning on the ground that the prosecutor was putting forth facts as evidence in the form of leading questions. Counsel moved for a mistrial on an unrelated ground – whether the jury might have seen Serrano in handcuffs in the hallway-but did not raise the leading question issue. The court denied the mistrial motion. Counsel did not request an admonition at that time.

In closing argument to the jury, the prosecutor made three references to supposed facts based on statements made by Salazar to Serrano that were not in evidence, i.e., had been put forward by the mechanism of the leading questions to Serrano.

(1) *Salazar's Statement of Remorse.* The prosecutor argued: "There is one undisputable in this case: Matthew Stephens was murdered on September 21st. And in the words of Mr. Salazar he was a completely innocent victim. He was a guy getting ready to go to work. And in the words of Mr. Salazar he didn't deserve to die. He died for selfish reasons."

(2) *An Unspecified Statement of Salazar to Serrano.* During argument, the prosecutor stressed that Gabriel Perez' description of Salazar's confession to him was credible. The prosecutor argued that the confession was consistent with [petitioner's] confessions to other witnesses, and "Salazar's comment to" Serrano.

(3) *The Leading Questions Themselves.* The prosecutor directly referred to the leading questions which Serrano refused to answer, and argued the jury could consider the factual content of the questions. After discussing Gabriel Perez' testimony, as well as Michael Johnson's, in which Johnson claimed he couldn't recall [petitioner's] statements to him-despite Johnson's describing those statements to police-the prosecutor argued:

"So you may choose to reject Gabe Perez, Michael Johnson, but then we have Yamileh Serrano, the witness that refused to answer any questions in this courtroom. You can consider that refusal, and you may consider what was in the question that she refused to answer."

Defense counsel made no contemporaneous objection to either (1) or (2). Salazar's counsel objected to (3). During a recess, defense counsel objected that the jury could not consider the factual content of the leading questions as evidence. Defense counsel also moved for a mistrial on the grounds of prosecutorial misconduct, arguing the prosecutor had referred to matters outside the record, invited the jury to speculate as to Serrano's possible answers to the leading questions, and denied defendants their right of confrontation.

The trial court agreed that the prosecutor's questions could not be considered as evidence and that the jury would be so admonished. The court denied the mistrial motion. When court reconvened the court admonished the jury "that the arguments of the attorneys are not evidence. The evidence is simply what you heard from the witness stand and any documents that are submitted to you for your review."

Prior to deliberations, the court instructed the jury with CALJIC No. 1.02, which reads, as here pertinent:

"Statements made by the attorneys during the trial are not evidence. . . . [¶] [D]o not

35

assume to be true any insinuation suggested by a question asked of a witness. A question is not evidence and may be considered only as it helps you to understand the answer."

Defendants moved for a new trial based on the alleged prosecutorial misconduct discussed above.  The court denied the motion, noting the court had given the cautionary instruction CALJIC No. 1.02.  The court also noted any error would not be prejudicial given the other evidence of defendants' guilt – which we regard as more than substantial.  The court also noted Serrano's hostile demeanor, and found the jury could have interpreted her refusal to answer questions and "defiance to the Court" as "based on the gang mentality of not testifying against each other."

Salazar, 2010 WL 3420122, at *10-13.

      b.  Prosecutorial Misconduct

Petitioner claims the prosecutor committed misconduct by posing leading questions to Serrano and referring to the questions in closing argument, even though Serrano refused to answer the questions.  The Court of Appeal rejected petitioner's prosecutorial misconduct claim concluding that, while the prosecution's questions were inappropriate, they did not prejudice petitioner:

Defendants argue that the prosecutor's leading questions, and jury argument based thereon, constitute misconduct.  We agree that the leading questions were inappropriate.  While it was permissible for the court to require Serrano claim her Fifth Amendment privilege, and refuse to answer questions, in the jury's presence (*Lopez, supra*, 71 Cal.App.4th at pp. 1555-1556), it was not permissible for the prosecutor to, in effect, introduce evidence in the form of the factual content of her leading questions.  (See *People v. Rios* (1985) 163 Cal.App.3d 852, 868-869.)

But the giving of the admonition and CALJIC No. 1.02 cured any error.  The jury was told in no uncertain terms that a statement made, or a question posed, by an attorney is not evidence.  Jurors are presumed to follow the trial court's instructions and decide the question of guilt on proper evidence.  (See, e.g., *People v. Barnett* (1998) 17 Cal.4th 1044, 1157; *People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8 ["We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade."]

We find no prejudicial error.

Salazar, 2010 WL 3420122, at *13 (footnote omitted).

Prosecutorial misconduct is cognizable in federal habeas corpus; "the appropriate standard of review for such a claim . . . is the narrow one of due process, and not the broad exercise of supervisory power."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted).  A defendant's due process rights are violated when a prosecutor's

36

1    misconduct renders a trial "fundamentally unfair."  Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982)

2    (noting, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

3    fairness of the trial, not the culpability of the prosecutor").  Under Darden, the first issue is

4    whether the prosecutor's remarks were improper; if so, the next question is whether such conduct

5    "infected the trial with unfairness."  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  A

6    prosecutorial misconduct claim is decided by "examining the entire proceedings to determine

7    whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting

8    conviction a denial of due process."  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (internal

9    quotation marks omitted).

10         The first factor in determining whether misconduct amounted to a due process violation is

11   whether the trial court issued a curative instruction to the jury.  See e.g., U.S. v. de Cruz, 82 F.3d

12   856, 862 (9th Cir. 1996); U.S. v. Simtob, 901 F.2d 799, 806 (9th Cir. 1990); U.S. v. Polizzi, 801

13   F.2d 1543, 1558 (9th Cir. 1986).  When a curative instruction is issued, a court presumes that the

14   jury has disregarded the improper remarks and that no due process violation occurred.  See Greer

15   v. Miller, 483 U.S. 756, 766, n.8 (1987).[7]

16         Other factors that a court may take into account in determining whether misconduct rises to

17   a due process violation are: (1) the weight of evidence of guilt, United States v. Young, 470 U.S.

18   1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v.

19   Sunn, 807 F.2d 805, 809 (9th Cir. 1987) ("courts will not reverse when the prosecutorial comment

20   is a single, isolated incident, does not stress an inference of guilt from silence as a basis of

21   conviction, and is followed by curative instructions"); and (3) whether the misconduct relates to a

22   critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972) (failure to disclose

23   information showing potential bias of witness especially significant because government's case

24   rested on credibility of that witness).

25         Here, respondent concedes that the prosecution's leading questions to Serrano and

26   references to such questions during closing argument were inappropriate.  See Br. in Supp. of

27   ───────────────

28   [7] To be sure, curative instructions are not a panacea.  See United States v. Lewis, 787 F.2d 1318, 1323 (9th Cir. 1986).  In this case, however, it is clear that any error was harmless.

United States District Court
Northern District of California

Answer at 39.  However, the prosecutor's misconduct did not infect the trial with such unfairness that the resulting conviction was a denial of due process.

First, the court instructed the jury multiple times that the statements and questions of attorneys are not evidence.  During cross-examination of prosecution witness Nicole Martin, the court cautioned the jury that "questions are not evidence." Ex. 4 at 1435.  The court reiterated that admonishment during the prosecution's direct examination of Officer Thomas Lenderman: "Remember, ladies and gentlemen, questions are not evidence.  Only the answers are evidence." Id. at 1855.  Prior to the prosecution's opening argument, the court instructed the jury that "[s]tatements made by attorneys during the trial are not evidence," id. at 2090-91, and during the prosecution's closing argument, the court instructed:

> [T]he arguments of attorneys are not evidence.  The evidence is simply what you heard from the witness stand and any documents that are submitted to you for your review.

Id. at 2156.  Finally, as noted above, the court issued to the jury CALJIC No. 1.02. Ex. 1 at 1097.  Having been adequately instructed, the jury is presumed to have ignored the prosecutor's improper remarks.  See Greer, 483 U.S. at 765-66 (prosecutor's misconduct in commenting on defendant's silence cured by proper instruction).

Second, the evidence weighed heavily against petitioner.  The collective testimony and statements of Gabriel Perez, Watts, Coria, Taylor, and Martin demonstrated that petitioner and Salazar had the white Pontiac at the time of the murder, and the Pontiac was inextricably linked with the murder.  Eby identified petitioner as the passenger in the white Pontiac. Ex. 4 at 1157-58.  Petitioner was a contributor to the DNA found on the jeans and shoes left near the Pontiac.  Id. at 1803-04, 1815.  Petitioner confessed to Johnson and Coria.  Id. at 1628-32, 2021.  Salazar told Gabriel Perez about the murder after Gabriel confronted him about the missing car.  Id. at 1284-88; Ex. 3 at 85-87, 91, 97-98, 118-19.  Detective Franzen testified that Coria said he knew the police were looking for two people for a murder, and that he heard about the murder from the people themselves—"E-Lo and Randy." Ex. 4 at 2018.  Watts, Coria, and Gabriel Perez had seen Salazar with the murder weapon, a distinctive revolver. Ex. 3 at 95-96.

Third, the misconduct was not extensive, having occurred only during the prosecution's

direct examination of Serrano and during closing argument.  See U.S. v. Wright, 625 F.3d 583, 609-13 (9th Cir. 2010) (several improper prosecutorial statements introducing evidence into the record and injecting personal views on evidence during 10-day trial were "relatively isolated incidents").

Lastly, the misconduct did not relate to a critical part of the case.  In her remarks to Serrano, the prosecutor insinuated that Salazar confessed his role in the murder to Serrano.  (Ex. 4 at 1713-15)  These remarks, however, tended merely to corroborate the testimony of Gabriel Perez, Michael Johnson, and Fernando Coria; they did not directly implicate petitioner, nor did they form the sole basis of his guilt.

In sum, the trial court corrected the improper statements made by the prosecution, and the other factors weigh against petitioner.  Based on the above, the Court finds that the state court's rejection of petitioner's due process claim based on the prosecution's questioning of Serrano was not unreasonable.  Accordingly, habeas relief is not warranted on this claim.

c.  Right to Confrontation

Petitioner claims the prosecution's leading questions to Serrano and references to those questions in closing argument also denied him his Sixth Amendment right to confront witnesses against him.

The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  "It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."  Id.; see also Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (noting "a primary interest" secured by the Confrontation Clause "is the right of cross-examination").  The right to cross-examine under the Confrontation Clause provides the opportunity to "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."  Davis, 415 U.S. at 318.

The Confrontation Clause applies to all "testimonial" statements.  Crawford, 541 U.S. at

United States District Court
Northern District of California

39

United States District Court
Northern District of California

50-51.  "Testimony . . . [is] typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Id. at 51 (alteration in original) (internal quotation marks omitted).  "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."  Id.  Out-of-court statements by witnesses that are "testimonial" in nature are barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness.  Id. at 59.

"Confrontation Clause violations are subject to harmless error analysis."  United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004); see also United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the standard is whether the allegedly inadmissible evidence "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Assertion of the Fifth Amendment privilege against self-incrimination by a witness, thus preventing cross-examination, constitutes unavailability of that witness.  See California v. Green, 399 U.S. 149, 167 (1970); Whelchel v. Washington, 232 F.3d 1197, 1204 (9th Cir. 2000).  Here, however, Serrano's purported prior statements that petitioner had confessed to the shooting were not admitted into evidence because the content of the prosecution's questions relating to the purported prior statements was not in evidence.  As discussed, the court instructed the jury that the statements of attorneys are not evidence.  (Ex. 1 at 109; Ex. 4 at 1435, 1855, 2090, 2156.)  Therefore, the prosecution's questions to Serrano did not violate the Confrontation Clause.

Further, the prosecution never asked Serrano about statements she purportedly made to the police.  Nor did the prosecution attempt to introduce statements made in connection with any government proceeding or investigation.  At most, the prosecution's offer of proof and questions to Serrano related only to petitioner's alleged confession to Serrano.  Petitioner has pointed to no authority, nor is the Court aware of any, suggesting that such remarks are "testimonial" for purposes of the Confrontation Clause under Crawford.  Because the statements were nontestimonial, to the extent they were admitted or considered by the jury, they did not violate the

1   Confrontation Clause.

2       Petitioner relies on Douglas v. Alabama, 380 U.S. 415 (1965), in support of his claim.

3   Petition at 18.  In Douglas, the defendant and another man, Loyd, were charged with assault with

4   intent to murder.  Douglas, 380 U.S. at 416.  The state tried Loyd first, and a jury convicted him.

5   The prosecutor called Loyd as a witness at the defendant's trial, but Loyd asserted the Fifth

6   Amendment and refused to answer questions about the incident.  Id. at 416.

7       While questioning Loyd, the prosecutor read a confession Loyd allegedly made to the

8   police wherein he inculpated the defendant.  Id.  "Under the guise of cross-examination to refresh

9   Loyd's recollection, the [prosecutor] purported to read from the document, pausing after every few

10  sentences to ask Loyd, in the presence of the jury, 'Did you make that statement?'  Each time,

11  Loyd asserted the privilege and refused to answer, but the [prosecutor] continued this form of

12  questioning until the entire document had been read."  Id. at 416-17.  The statements the

13  prosecutor read from the document "recited in considerable detail the circumstances leading to and

14  surrounding the alleged crime; of crucial importance, they named the [defendant] as the person

15  who fired the shotgun blast which wounded the victim."  Id. at 417.  The defendant was found

16  guilty.  The United States Supreme Court reversed the conviction, holding that the defendant's

17  inability to cross-examine Loyd about the alleged confession denied him "the right of cross-

18  examination secured by the Confrontation Clause."  Id. at 419.

19      Petitioner's reliance on Douglas is misplaced.  In Douglas, the defendant did not move to

20  strike either the witness' nonresponsive testimony or the prosecutor's leading questions.  Here, the

21  court cautioned the jury multiple times that the statements of attorneys are not evidence (Ex. 4 at

22  1435, 1855, 2090, 2156), and instructed the jury to the same effect with CALJIC No. 1.02 (Ex.1 at

23  1097).  "The assumption that jurors are able to follow the court's instructions fully applies when

24  rights guaranteed by the Confrontation Clause are at issue."  Tennessee v. Street, 471 U.S. 409,

25  415 n.6 (1985); see also Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("Confrontation Clause is

26  not violated by the admission of a nontestifying codefendant's confession with a proper limiting

27  instruction . . . ").

28      Further, the Supreme Court overturned the conviction in Douglas because the testimony at

United States District Court
Northern District of California

41

1    issue was the only direct evidence of the defendant's culpability.  See Douglas, 380 U.S. at 419.

2    Here, as discussed, Serrano's testimony was not the only evidence of petitioner's guilt; there was

3    other independent evidence connecting petitioner with the murder, including physical evidence,

4    Ex. 4 at 1803-04, the testimony of William Eby, id. at 1157-58, confessions that petitioner made to

5    Fernando Coria and Michael Johnson, id. at 1623-31, 2017-26, and a confession that Salazar made

6    to Gabriel Perez, id. at 1284-90.  See United States v. Larson, 495 F.3d 1094, 1108 (9th Cir. 2007)

7    (Confrontation Clause violation rendered harmless by strength of other evidence and court

8    instruction).

9           Based on the above, the Court finds that the state court's rejection of petitioner's

10   confrontation claim was not unreasonable.  Accordingly, habeas relief is not warranted on this

11   claim.

12          4.      Codefendant Salazar's Statements

13          Petitioner claims his right to due process was violated by the admission of codefendant

14   Salazar's out-of-court statements implicating petitioner.  FAP at 18-20.  The highest court to have

15   considered this claim in a reasoned opinion was the California Court of Appeal on direct appeal.

16   The Court of Appeal summarized the background of this claim as follows:

17          Prior to trial, [petitioner] moved to exclude Salazar's statements to Gabriel Perez as
             hearsay subject to no exception.  [Petitioner] focused on Salazar's statements that he and
18          [petitioner] encountered the victim outside; that [petitioner] was holding a gun in the air;
             that [petitioner] wrestled with the victim and his gun went off; and that Salazar threw the
19          gun in the river.

20          The trial court denied the motion, ruling the statements admissible under the exception to
21          the hearsay rule for declarations against penal interest:  "[A]fter reviewing each and every
             one of them and the circumstances under which they were made ... I do find that they
22          qualify as declarations against interest.  I've reviewed the circumstances of the statements,
             whether or not they were disserving of penal interests, whether or not they had indicia of
23          reliability, and the totality of the circumstances as well as the statements themselves and
             find that they do qualify under Evidence Code section 1230.  So they will be admissible on
24          that basis."

25   Salazar, 2010 WL 3420122, at *9.

26          The Court of Appeal agreed that Salazar's statement to Gabriel Perez was admissible

27   hearsay as a statement against penal interest pursuant to California Evidence Code § 1230.  Id.

28

United States District Court
Northern District of California

1    The Court of Appeal further found that any error would be harmless in light of the other evidence

2    against petitioner.  Id

3          The admission of evidence is not subject to federal habeas review unless a specific

4    constitutional guarantee is violated or the error is of such magnitude that the result is a denial of

5    the fundamentally fair trial guaranteed by due process.  Henry v. Kernan, 197 F.3d 1021, 1031

6    (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  Due process is violated

7    only if there are "no permissible inferences the jury may draw from the evidence."  Jammal v. Van

8    de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  The Supreme Court "has not yet made a clear ruling

9    that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

10    sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.

11    2009).  Even if an evidentiary error is of constitutional dimension, the court must consider whether

12    the error had a substantial and injurious effect on the verdict.  Brecht, 507 U.S. at 638;  Dillard v.

13    Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

14          Here, petitioner has not shown that a specific constitutional guarantee was violated or that

15    he was denied a fair trial.  Under section 1230 of the California Evidence Code, Salazar's out-of-

16    court statement to Perez admitting that he and petitioner actively participated in a robbery attempt

17    in which the victim was killed was a statement against Salazar's penal interest, thus making it

18    admissible as an exception to California's hearsay rules.  Because the jury could have drawn the

19    "permissible inference" that Salazar would not have made such statement unless he knew it to be

20    true as well as the "permissible inference" that the statement connected petitioner to the murder,

21    petitioner's constitutional rights were not violated.  See Jammal, 926 F.2d at 920.

22          Finally, a review of the record demonstrates that the prosecutor's case against petitioner

23    was strong, so that even if the admission of Salazar's statements to Perez constituted error, there

24    was no due process violation.  As discussed above, petitioner's identity as the murderer was

25    supported by physical evidence and the testimony of many witnesses.

26          Based on the above, the Court finds that the state court's rejection of petitioner's due

27    process claim based on the admission of Salazar's statements to Perez was not unreasonable.

28    Accordingly, habeas relief is not warranted on this claim.

United States District Court
Northern District of California

43

United States District Court
Northern District of California

1
2
3
C.      Certificate of Appealability

4
The federal rules governing habeas cases brought by state prisoners require a district court

5
that issues an order denying a habeas petition to either grant or deny therein a certificate of

6
appealability.  See Rules Governing § 2254 Case, Rule 11(a).

7
A judge shall grant a certificate of appealability "only if the applicant has made a

8
substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

9
certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district

10
court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

11
is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

12
court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S.

13
473, 484 (2000).

14
Here, petitioner has not made such a showing, and, accordingly, a certificate of

15
appealability will be denied.

16
**IV.  CONCLUSION**

17
For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a

18
certificate of appealability is DENIED.

19
The Clerk shall enter judgment in favor of respondent and close the file.

20
Additionally, the Clerk is directed to substitute Clark E. Ducart on the docket as the

21
respondent in this action.

22
**IT IS SO ORDERED.**

23
Dated:  February 18, 2015

24
_____

25
JON S. TIGAR
United States District Judge

26
27
28

44